1

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

2

3

4

5

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

6

7

8

9

*Attorneys for Plaintiffs*

10

11

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| DUA SHAMSI and BIANCA JOHNSTON, individually and on behalf of all others similarly situated, | Case No. |
|---|---|
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| THRIFT BOOKS GLOBAL, LLC, | |
| Defendant. | |

Plaintiffs Dua Shamsi and Bianca Johnston ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated (the "Class Members") against Defendant Thrift Books Global, LLC ("Defendant" or "Thrift Books"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.     This class action lawsuit is brought on behalf of all California residents who have accessed and used Defendant's web-based reading materials service, thriftbooks.com (the "Website"), to search for, obtain, or otherwise access reading and materials (the use of the Website known as the "Thrift Books Service").

2.     Defendant aids, employs, agrees, and conspires with third parties Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook") and Pinterest, Inc. ("Pinterest" and together with Facebook, the "Third Parties") to intercept communications sent and received by Plaintiffs and Class Members, including communications containing protected reading preferences. Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions. By failing to procure consent before enabling Facebook and Pinterest's interception of these communications, and by disclosing such information to Facebook and Pinterest, Defendant violated the California Invasion of Privacy Act §§ 631-632 and the California Constitution.

## PARTIES

### *Plaintiffs*

3.     Plaintiff Dua Shamsi is a citizen of the State of California over the age of 18, and lives in Oakland, California with an intent to remain there. Plaintiff Shamsi is therefore a resident of California.

4.     Plaintiff Shamsi first used the Thrift Books Service on the Website to search for and obtain reading materials, including books and audiobooks, in approximately 2022. From approximately June 2022 through approximately February 2025, Plaintiff Shamsi has regularly accessed the Thrift Books Website to search for and purchase books and audiobooks to later read and listen to.

5.      When Plaintiff Shamsi used the Website to view or purchase reading materials, Defendant intercepted her communications with the Website that viewed or obtained books and audiobooks on the Website.  Defendant then disclosed this information in conjunction with Plaintiff Shamsi's personally identifiable information ("PII") to Facebook and Pinterest. Specifically, as a result of Defendant's unlawful conduct as alleged herein, Facebook and Pinterest helped Defendant intercept and collect information about Plaintiff Shamsi's search and view history on the Website.

6.      At all relevant times, Plaintiff Shamsi never consented to, agreed to, or otherwise permitted Defendant to disclose her personally identifiable information and the record of materials that Plaintiff Shamsi viewed and obtained on the Thrift Books Service to third parties, including to Facebook and Pinterest.

7.      Likewise, Defendant never gave Plaintiff Shamsi the opportunity to prevent the disclosure of her personally identifiable information and the record of materials that Plaintiff Shamsi viewed and obtained on the Thrift Books Service to Facebook and Pinterest.

8.      Plaintiff Shamsi has an active Facebook account, which she has maintained for over 10 years.  During that time, Plaintiff Shamsi routinely logged onto her Facebook account on the same web browser she used to access Defendant's Website.

9.      Plaintiff Shamsi has an active Pinterest account, which she has maintained for approximately 8 years.  During that time, Plaintiff Shamsi routinely logged onto her Pinterest account on the Pinterest website and mobile application.

10.     Pursuant to the systematic process described herein, Defendant assisted Facebook and Pinterest with intercepting Plaintiff Shamsi's protected communications on the Website without her consent, including those that contained personally identifiable information and reading preferences.

11.     By failing to receive the requisite consent from Plaintiff Shamsi, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Shamsi's personally identifiable information and protected reading preferences to Facebook and Pinterest.

12.     Plaintiff Bianca Johnston is a citizen of the State of California over the age of 18,

and lives in Big Bear, California with an intent to remain there. Plaintiff Johnston is therefore a resident of California.

13.    Plaintiff Johnston first used the Thrift Books Service on the Website to search for and obtain reading materials, including books and audiobooks, in approximately 2020. From approximately 2020 through approximately February 2025, Plaintiff Johnston has regularly accessed the Thrift Books Website to search for and purchase books and audiobooks to later read and listen to.

14.    When Plaintiff Johnston used the Website to view or purchase reading materials, Defendant intercepted her communications with the Website that viewed or obtained books and audiobooks on the Website. Defendant then disclosed this information in conjunction with Plaintiff Johnston's personally identifiable information to Facebook and Pinterest. Specifically, as a result of Defendant's unlawful conduct as alleged herein, Facebook and Pinterest helped Defendant intercept and collect information about Plaintiff Johnston's search and view history on the Website.

15.    At all relevant times, Plaintiff Johnston never consented to, agreed to, or otherwise permitted Defendant to disclose her personally identifiable information and the record of materials that Plaintiff Johnston viewed and obtained on the Thrift Books Service to third parties, including to Facebook and Pinterest.

16.    Likewise, Defendant never gave Plaintiff Johnston the opportunity to prevent the disclosure of her personally identifiable information and the record of materials that Plaintiff Johnston viewed and obtained on the Thrift Books Service to Facebook and Pinterest.

17.    Plaintiff Johnston has an active Facebook account, which she has maintained for over 10 years. During that time, Plaintiff Johnston routinely logged onto her Facebook account on the same web browser she used to access Defendant's Website.

18.    Plaintiff Johnston has an active Pinterest account, which she has maintained for approximately 10 years. During that time, Plaintiff Johnston logged onto her Pinterest account on the Pinterest website.

19.    Pursuant to the systematic process described herein, Defendant assisted Facebook

and Pinterest with intercepting Plaintiff Johnston's protected communications on the Website without her consent, including those that contained personally identifiable information and reading preferences.

20.    By failing to receive the requisite consent from Plaintiff Johnston, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Johnston's personally identifiable information and protected reading preferences to Facebook and Pinterest.

### *Defendant*

21.    Thrift Books Global, LLC is incorporated in Seattle, Washington and has its principal place of business in Seattle, Washington.  Defendant owns and operates the digital book and audiobook catalog available nationwide and found at thriftbooks.com.

### JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of a different state than Defendant.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

23.    This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff Shamsi's claims took place within this District and Plaintiff Shamsi was subject to Defendant's Thrift Book Service in this District.

### FACTUAL ALLEGATIONS

I.    **OVERVIEW OF THE LAW**

    A.    **California Information Privacy Act**

25.    The California Information Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*,

1    prohibits aiding or permitting another person to willfully—and without the consent of all parties to

2    a communication—read or learn the contents or meaning of any message, report, or

3    communication while the same is in transit or passing over any wire, line, or cable, or is being sent

4    from or received at any place within California.

5        26.    To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish

6    that the defendant, "by means of any machine, instrument, contrivance, or in any other manner,"

7    does any of the following:

8            Intentionally taps, or makes any unauthorized connection, whether
             physically, electrically, acoustically, inductively or otherwise, with
9            any telegraph or telephone wire, line, cable, or instrument, including
10           the wire, line, cable, or instrument of any internal telephonic
             communication system,

11
12           Or

13           Willfully and without the consent of all parties to the
             communication, or in any unauthorized manner, reads or attempts to
14           read or learn the contents or meaning of any message, report, or
             communication while the same is in transit or passing over any wire,
15           line or cable or is being sent from or received at any place within
             this state,
16
17           Or

18           Uses, or attempts to use, in any manner, or for any purpose, or to
             communicate in any way, any information so obtained,
19
20           Or

21           Aids, agrees with, employs, or conspires with any person or persons
             to unlawfully do, or permit, or cause to be done any of the acts or
22           things mentioned above in this section.

23       27.    Section 631(a)'s applicability is not limited to phone lines but also applies to "new

24   technologies" such as computers, the internet, and email.  *See Matera v. Google Inc.*, 2016 WL

25   8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be

26   construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v.*

27   *Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic

28   communications"); *In re Facebook, Inc. Internet Tracking Litigation*,  956 F.3d 589 (9th Cir. 2020)

(reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

28.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

29.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

30.     Individuals may bring an action against the violator of CIPA §§ 631 and 632. Under Cal. Penal Code § 637.2, Plaintiffs and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.     California Patron Use Records Act**

31.     The California Legislature enacted the Patron Use Records Act to protect certain privacy rights of California citizens accessing library services.

32.     The California Patron Use Records Act, Cal. Gov't Code § 7927.105, prohibits the unauthorized disclosures of information that identifies a library patron's "borrowing information or use of library information resources" and "[a]ny written or electronic record that is used to identify a library patron."  Cal. Gov't Code § 7929.105(a).  The prohibited records that could be used to identify a patron "include[], but is not limited to, a patron's name, address, telephone number, or email address."  *Id.* at (a)(1).  And the prohibited records that identify a person's borrowing information or use of library resources "includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries."  *Id.* at (a)(2).

33.     The statute prohibits disclosure of such information "to any person, local agency, or state agency," except for use in library administrative duties, with the patron's authorization in writing, or by court order, and creates a privacy interest for Californian library patrons in their

1    personally identifiable information and their borrowing information and library resource usage.  *Id.*

2    at (c).

3        34.    As can be seen from the enaction of this statute, California has a strong expressed

4    legislative intent to protect the privacy rights of individuals' reading materials and uses of research

5    materials—going to lengths to ban disclosures of which individual searched for or obtained which

6    library materials and library resource information.

7        **C.    California Reader Privacy Act**

8        35.    The California Reader Privacy Act, Cal. Civ. Code § 1798.90, was enacted to

9    further prevent providers of book services from disclosing or being compelled to disclose "any

10   personal information relating to a user of the book service."  Legislative Counsel's Digest to Cal.

11   Civ. Code § 1798.90.  The statute prohibits "commercial entit[ies] offering … book service[s] to

12   the public" from "knowingly disclos[ing] to any government entity," or being "compelled to

13   disclose to any person[] [or] private entity" a user's "personal information."  *Id.*

14       36.    A "[b]ook service" is defined as a service that primarily "provides the rental,

15   purchase, borrowing, browsing, or viewing of books."[1]  Cal. Civ. Code § 1798.90(b)(2).

16   Defendant's Thrift Books Service constitutes a book service here.

17       37.    "Personal information" is defined as:

18           (A) Any information that identifies, relates to, describes, or is
             associated with a particular user, including, but not limited to, the
19           information specifically listed in Section 1798.80.

20           (B) A unique identifier or Internet Protocol address, when that
             identifier or address is used to identify, relate to, describe, or be
21           associated with a particular user or book, in whole or in partial form.

22           (C) Any information that relates to, or is capable of being associated
             with, a particular user's access to or use of a book service or a book,
23           in whole or in partial form.

24   Cal. Civ. Code § 1798.90(b)(2).

25

26   _____

27   [1] The statute explicitly carves out stores that sell "a variety of consumer products" with book
     service sales that "do not exceed 2 percent of the store's total annual gross sales of consumer
     products sold in the United States," which is not applicable to Defendant here.  Cal. Civ. Code §
28   1798.90(b)(2).

38.     While this statute focuses on prohibiting disclosures of personal information to government entities, the explicit ban on disclosing "personal information relating to a user of [a] book service" further demonstrates California's strong intent in protecting the private reading and reading-material browsing history of its citizens.

## II.     OVERVIEW OF THE PARTIES

### A.     Defendant Provides Reading Materials From Its Digital Catalog

39.     Thrift Books is "the world's largest online independent used book seller" and provides an online catalog of 13 million book titles.[2]  To use the Thrift Books Service to view and purchase reading materials, a user of the Website can either create an account with Thrift Books or checkout as a "guest."[3]  Thrift Books boasts that it "leverage[es] data to improve merchandising yielding better bundles and revenues for the business and improved access for [their] customers."[4]

40.     Defendant owns and operates the Website, which provides the Thrift Books Service and distributes and sells reading materials to consumers across the entire United States.

### B.     The Thrift Books Service Integrated Third Party Pixels

41.     **Facebook.**  Per Plaintiffs' counsel's investigation, Defendant intercepts and discloses to Facebook individual users' personally identifiable information in the form of their Facebook account and the full title of the materials that individuals search for, listen to, and purchase on the Thrift Books Service.  This is achieved through Defendant's integration of a piece of tracking pixel call the Facebook Pixel ("Facebook Pixel") onto the Website.

42.     A research paper presented at the Association for Computing Machinery Web Conference in 2023 states that "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it.[5]  "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel

---

[2] *Our Story*, Thrift Books, https://www.thriftbooks.com/about-thriftbooks/ (last accessed Feb. 4, 2025).

[3] Thrift Books, https://www.thriftbooks.com/checkout/ (last accessed Feb. 4, 2025).

[4] *Our Purpose*, Thrift Books, https://www.thriftbooks.com/about-thriftbooks/our-purpose/ (last accessed Feb. 4, 2025).

[5] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with*

loads in the HTML code of the page on the browser."[6]  "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved[.]"[7]  Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Facebook)] servers[] … [and] report[s] to [the third party (*i.e.*, Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user.  This can be used [] to track [] audiences for brand ads[.]"[8]

43.      To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[9]  Once active, this code will load "a library of functions [(*i.e.*, fbevents.js for the Pixel] … on the website[.] … This library is the core mechanism[s] of the FB Pixel."[10]  In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Facebook], by defining *events*, *i.e.*, actions, that a user takes on the website."[11]  When in use, the tracking pixels then "reports to [Facebook] information about [each] event and [the] user that caused it," for Facebook's "future use in ad-conversion and further user profiling and tracking[.]"[12]

44.      Defendant discloses users' personally identifying information and the information they viewed or obtained on the Thrift Books Service to Facebook so that it can obtain the marketing, advertising, and analytics technological tools that Facebook provides.  Facebook describes itself as a "real identity platform,"[13] meaning users are allowed to "create only one

---

*Invisible Pixels and Click IDs*, at 2, (2023) ARXIV, https://arxiv.org/pdf/2208.00710 (last accessed Feb. 4, 2025).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, The Wall Street Journal, Oct. 21, 2021,

account using the name they go by in everyday life that represents their authentic identity."[14]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[15]

45.    In 2024, Facebook generated $164.5 billion in revenue.[16]  Approximately $160.6 billion of that was earned through advertising.[17]

46.    Facebook sells advertising space by highlighting its ability to target users.[18] Facebook can target users so effectively because it surveils user activity both on and off its site.[19] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[20]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[21]

47.    Advertisers can also build "Custom Audiences."[22]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[23]  With Custom

https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed Feb. 4, 2025).

[14] *Authentic Identify Representation*, Meta, https://transparency.meta.com/policies/community-standards/authentic-identity-representation (last accessed Feb. 4, 2025).

[15] *Create A New Account*, Facebook, https://www.facebook.com/reg/ (last accessed Feb. 4, 2025).

[16] *Meta*, https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx (last accessed Feb. 5, 2025).

[17] *Id.*

[18] *Why Advertise On Facebook, Instagram and Other Meta Technologies*, Meta, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 4, 2025).

[19] *About Meta Pixel*, Meta, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 4, 2025).

[20] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[21] *Meta*, https://www.facebook.com/business/news/Core-Audiences (last accessed Feb. 4, 2025).

[22] *About Custom Audiences*, Meta, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last accessed Feb. 4, 2025).

[23] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[24]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[25]

48.    As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[26]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

49.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[27]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can

---

[24] *About Lookalike Audiences*, Meta, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed Feb. 4, 2025).

[25] *Create A Customer List Custom Audience*, Meta, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last accessed Feb. 4, 2025); *Create A Website Custom Audience*, Meta, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed Feb. 4, 2025).

[26] *The Meta Business Tools*, Facebook, https://www.facebook.com/help/331509497253087 (last accessed Feb. 4, 2025).

[27] *See Meta Pixel: Advanced*, Meta, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last accessed Feb. 4, 2025); *see also Best Practices For Meta Pixel Setup*, Meta, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed Feb. 4, 2025); *Marketing API: App Events API*, Meta, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

choose, including what content a visitor views or purchases.[28]  Advertisers can even create their

own tracking parameters by building a "custom event."[29]

50.    Facebook offers the Facebook Pixel as a Business Tool to advertisers, like

Defendant, to integrate into their websites.  The Facebook Pixel "tracks the people and type of

actions they take."[30]  When a user accesses a website hosting the Facebook Pixel, Facebook's

software script surreptitiously directs the user's browser to contemporaneously send a separate

message to Facebook's servers.  This second, secret transmission contains the original GET request

sent to the host website, along with additional data that the Facebook Pixel is configured to collect.

This transmission is initiated by Facebook code and concurrent with the communications with the

host website.  At relevant times, two sets of code are thus automatically run as part of the browser's

attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded

code.

51.    Defendant chose to include the Facebook Pixel on its Website.

52.    Facebook's own documentation makes clear just how much tracking of private

information the Facebook Pixel does.  It describes the Facebook Pixel as code that Facebook's

business customers can put on their website to "[m]ake sure your ads are shown to the right people.

***Find … people who have visited a specific page or taken a desired action on your website***."[31]

53.    Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log
> when someone takes an action on your website***.  Examples of
> actions include adding an item to their shopping cart or making a

---

[28] *Specifications For Meta Pixel Standard Events*, Meta,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed
Feb. 4, 2025).

[29] *About Standard And Custom Website Events*, Meta,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed
Feb. 4, 2025); *see also Marketing API: App Events API*, Meta
https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

[30] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last accessed Feb. 4,
2025).

[31] *About Meta Pixel*, Meta,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis
added) (last accessed Feb. 4, 2025).

purchase. ***The Pixel receives these actions, or events***, which you can view on your [Facebook Tracking] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. ***You'll also have options to reach those customers again through future Meta ads***.[32]

54.    The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own users outside the Website, but also to include individual users among groups targeted by ***other*** Facebook advertisers relating to the conditions about which users communicated on Defendant's Website.

55.    Facebook's Business Help Center explains:

> Meta ***uses marketing data to show ads to people who are likely to be interested in them***. One type of marketing data is website events, which are ***actions that people take on your website***.[33]

56.    In other words, Facebook sells advertising space by highlighting its ability to target users.[34] Facebook can target users so effectively because it surveils user activity both on and off its site.[35] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "people who share interests with … current customers."[36]

57.    An example illustrates how the Facebook Pixel works. Take an individual who navigates to Defendant's Website and views or buys a particular book or audiobook. When that action is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because the Thrift Books Service integrated and utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook

---

[32] *Id.* (emphasis added).

[33] *About Standard And Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added) (last accessed Feb. 4, 2025).

[34] *Why Advertise On Facebook, Instagram And Other Meta Technologies*, Meta, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 4, 2025).

[35] *About Meta Pixel*, Meta, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 4, 2025).

[36] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

58.    After collecting and intercepting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

59.    **Pinterest.**  Per Plaintiffs' counsel's investigation, Defendant also intercepts and discloses to Pinterest individual users' personally identifiable information in the form of their Pinterest account and the full title of the materials that individuals search for, listen to, and purchase on the Thrift Books Service.  This is achieved through Defendant's integration of a piece of tracking code called the Pinterest Tag ("Pinterest Tag" or "Tag") onto the Website.

60.    Defendant chose to integrate the Pinterest Tag onto its Website.

61.    The Pinterest Tag works similarly to the Facebook Pixel and allows Defendant "to track actions people take on [Defendant's] website."[37]  The Pinterest Tag is a "piece of code" that can be added to a website, which "lets Pinterest track visitors to [the] site, as well as the actions [those users] take on your site."[38]  "For example, cookies allow websites to keep track of the items in your cart as well as other pieces of information."[39]  Defendant discloses users' personally identifying information and the information they viewed or obtained on the Thrift Books Service to Pinterest via the Pinterest Tag so that it can obtain the marketing, advertising, and analytics technological tools that Pinterest provides.

---

[37] *Pinterest Tag*, Pinterest, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,you%20want%20to%20track%20conversions (last accessed Feb. 4, 2025).

[38] *Install the Pinterest Tag*, Pinterest, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last accessed Feb. 4, 2025).

[39] *View Tag Parameters And Cookies*, Pinterest, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last accessed Feb. 4, 2025).

62.    Pinterest only allows users to create one account per individual email address.[40] Each user's account also corresponds with an individual account ID—a unique string of numbers and letters that identifies that particular Pinterest account.

63.    Pinterest's own website describes how much private information of users, including users' private reading information, can be captured through the Tag.  The Tag allows Pinterest to track Pinterest users' activities on the Website through the Universal Resource Locator ("URL") of a Pinterest Tag network request, which contains the captured data and sends it to Pinterest.[41]  The Pinterest Tag captures the page visits and actions on those pages that users incur "while browsing the internet."[42]  Specifically, in the URLs that Defendant sends to Pinterest are the event data.  This includes the name of the event captured, such as "pagevisit, addtocart, [and] checkout."[43]  This also includes event data for specific events that developers like Defendant choose to send to Pinterest outside of Pinterest's offered selection.[44]

64.    Pinterest offers developers like Defendant the ability to capture certain types of pre-set user events.  These include a "pagevisit" that captures when a user views any page on a website, "checkout" that tracks what a user purchased, the quantity, currency, and value of the purchase, and even include "watchvideo," which tracks when a user watches a video and what the video title is.[45] If developers like Defendant wish, they also have the option to use the Pinterest Conversions API in addition to the Pinterest tag, to "maximize visibility into conversions."[46]

---

[40] *Get A Pinterest Account*, Pinterest, https://help.pinterest.com/en/article/get-a-pinterest-account (last accessed Feb. 4, 2025).

[41] *View Tag Parameters And Cookies*, Pinterest, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last accessed Feb. 4, 2025).

[42] *Id.*

[43] *Id.*

[44] *See id.*

[45] *Pinterest Tag*, Pinterest, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,you%20want%20to%20track%20conversions (last accessed Feb. 4, 2025).

[46] *Install the Pinterest Tag*, Pinterest, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last accessed Feb. 4, 2025).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                         15

65.     Pinterest assigns a unique user ID to every account and every event captured also notes the unique user ID of the user who initiated the action.  This is transmitted through web browser cookies.  The Pinterest Tag sets and transmits several small files of data, called cookies.[47] When a user visits a website, the browser, here Defendant's Website, sends data to the server, which in turn sends a cookie to the user's browser.  As a final step, this cookie is stored in the user's browser.  Thereafter, every time the user visits that website again, the browser sends the same cookie back to the server, which recognizes the user based on the cookie and retrieves the stored information about that user based on the individual cookie.

66.     One notable Pinterest Tag cookie is the "_pinterest_sess" cookie.[48]  This cookie "contains the person's Pinterest ID as well as the person' authentication tokens if the person is logged into Pinterest."[49]  Therefore, because the Tag is integrated on the Website's webpages, every time a user visits pages on the Website, the user's browser sends this cookie—which contains the user's unique Pinterest ID—to Pinterest's servers.  Even if the user is logged out of their Pinterest account, the Pinterest Tag "leave[s] the cookie present" without the authentication tokens.  This means that Pinterest still "use[s] the logged out user ID(s)" in its transmissions that contain the user's event data to "optimize the person's experience and measurement" and provide Defendant with data analytics to enhance Defendant's marketing, advertising, and analytics of its users.[50]

67.     Another notable Pinterest Tag cookie is the "_pinterest_ct_rt" cookie.[51]  This particular cookie is set "whenever [a] person visits" a website that "has the Pinterest [T]ag installed."[52]  This cookie is conditional and is set based off the existence of another cookie, the _pinterest_sess cookie.  The _pinterest_ct_rt cookie "contain[s] a user ID and the timestamp at

---

[47] *View Tag Parameters And Cookies*, Pinterest, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last accessed Feb. 4, 2025).

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

which the cookie was created."[53]  For at least one year, these cookie identifiers that distinguish

individual users from each other through their Pinterest account IDs do not change.[54]

68.    In addition, Pinterest also offers developers like Defendant an additional tool, called

enhanced match, to "match[] conversion data [*i.e.*, users' event data] with the person responsible

for the conversion."[55]  This option allows developers like Defendants to allow the Pinterest Tag to

"send[] hashed email addresses to Pinterest to match site events when there's no Pinterest cookie

present."[56]  While the emails sent to Pinterest must be "hashed"[57] first, Pinterest is able to "match"

the hashed email address to email addresses in its portfolio of saved user accounts and data through

its own backend tools.  "Pinterest checks to see if the hashed information is associated with an

existing Pinterest account for the purposes of matching more of your website visitors and

conversions to people on Pinterest."[58]  This process further verifies the accuracy of the user data

that Pinterest captures and analyzes for Defendant.

69.    Once the Pinterest Tag integrated on a website with enhanced matching enabled

"transmits" a user's email address "to the Pinterest server, Pinterest checks to see if it's associated

with an existing Pinterest account for the purpose of matching" the user's activity with their

existing Pinterest account and event history.[59]

---

[53] *Id.*

[54] *Id.*  Pinterest notes that individuals can delete these cookies whenever they wish to.  However, it provides no clear option for users to do so and therefore greatly reduces the likelihood that Pinterest users delete these cookies that Pinterest assigns to them.  Further, while the cookies may be deleted, individual Pinterest users' account IDs do not change, just the timestamp of the creation of the cookie changes.

[55] *Enable Optional Enhanced Match*, Pinterest, https://help.pinterest.com/en/business/article/enhanced-match (last accessed Feb. 4, 2025).

[56] *Id.*

[57] *Enable Automatic Enhanced Match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match ("The hashing process turns the information into a short, text string that cannot be read by humans.") (last accessed Feb. 4, 2025).

[58] *Id.*

[59] *Id.*

70.     Further, Pinterest offers developers like Defendant the choice to set up and allow "automatic enhanced match" procedures.[60]  This function "lets [Defendant] securely share hashed information that customers have provided via form fields on [Defendant's] website[] with Pinterest."[61]  By default, Pinterest automatically enables this automatic enhanced match option for developers when they first install the Pinterest Tag.[62]

71.     Pinterest analyzes the user data for Defendant, conglomerating it into one "reporting dashboard."[63]  For developers like Defendant, they can easily view the data that Pinterest tracks and analyzes for them in their Pinterest business account.  Pinterest provides developers like Defendant with a graph containing several filters "to see a visual representation of [Defendant's] ads performance, and a reporting table where [Defendant] can view or export [its] data."[64]  This dashboard is dynamic, and developers like Defendant "can customize the data shown in the graph and reporting table by selecting and creating filters."[65]

72.     Just as with the Facebook Pixel, when a user clicks an action on the Website, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because the Thrift Books Service integrated and utilizes the Tag, Pinterest's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Pinterest causes the browser to secretly duplicate the communication with Defendant, transmitting it to Pinterest's servers, alongside additional information that transcribes the communication's content and the individual's identity.

73.     After collecting and intercepting the information described in the preceding paragraph, Pinterest processes it, analyzes it, and assimilates it into datasets for Defendant so that Defendant can boost its marketing, analytics, and advertising.

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Review Reporting*, Pinterest, https://help.pinterest.com/en/business/article/reporting-dashboard-overview (last accessed Feb. 4, 2025).

[64] *Id.*

[65] *Id.*

1

**III.    DEFENDANT KNOWINGLY DISCLOSES USERS' PROTECTED READING INFORMATION AND ASSISTED WITH INTERCEPTING PRIVATE COMMUNICATIONS**

2

3      74.    Through the Facebook Pixel and the Pinterest Tag, Defendant assists the Third

4    Parties with intercepting the identities and online rental activity of Defendant's users on the Thrift

5    Books Service, including information relating to the reading materials that users viewed and

6    bought.

7          **A.    Defendant Discloses Users' Protected Reading And Personally Identifying Information to Facebook**

8

9      75.    When a user searches for a book or audiobook on the Website, Defendant discloses

10   to Facebook through the Pixel the contents of the user's search.  For example, the following

11   screenshot of the network traffic shows Defendant sending to Facebook the following network

12   transmission of a user searching for "Tolkien."  In the Universal Resource Locator ("URL") of the

13   request, red squares highlight that the individual user: (i) viewed a page (denoted by the

14   "ev=PageView"); (ii) that was viewed on the Thrift Books Service located at thriftbooks.com; and

15   (iii) specifically, this user searched for "tolkien."

16

17   ▼ Request Headers

     :authority:          www.facebook.com

18   :method:             GET

     :path:               /tr/?

19                        id=4058754696228198&ev=PageView&dl=https%3A%2F%2Fwww.thriftbooks.com%2Fbrow

                          se%2F%3Ft=search%3D0tolkien%23b.s%3DmostPopular-

20                        desc%26b.p%3D1%26b.pp%3D3D50%26b.oos%26b.tile&rl=https%3A%2F%2Fwww.thriftbook

                          s.com%2Fbrowse%2F%3F137&if=false&ts=1738731964348&sw=2753&sh=1152&v=2.9.1

21                        82&r=stable&ec=13&o=4126&fbp=fb.1.1738727903281.432032170239916145&cs_est=tr

                          ue&ler=other&cdl=API_unavailable&it=1738728160934&coo=false&rqm=GET

22   :scheme:             https

     Accept:              image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

23   Accept-Encoding:     gzip, deflate, br, zstd

     Accept-Language:     en-US,en;q=0.9

24   Cookie:              datr=VcJEZ8rg0RWuncoGa9rj2-SU; sb=VcJEZ-P95Ew6tRvPsCH8Sl9u; ps_n=1;

25                        c_user=61557047663647; xs=10%3APkrbdshQxPD4Fw%3A2%3A1737731908%3A-1%3A-1;

                          fr=0T3RVY2321obZSGl8.AWVWoCoeDv2CMwD89hyI0nmQoRk.BnRMJV..AAA.0.0.Bnk69F.A

26                        WUVxSovblo; dpr=1.25; ar_debug=1

27

28

1     76.     In addition, Defendant also discloses to Facebook through the Pixel the specific

2   book titles that a user viewed.  In the following screenshot of the network transmissions sent to

3   Facebook through the Pixel, Defendant discloses how the user viewed the book of J.R.R. Tolkien's

4   *The Hobbit*.  In the following screenshot's URL of the request, red squares highlight that the

5   individual user: (i) viewed a page (denoted by the "ev=ViewContent"); (ii) that was viewed on the

6   Thrift Books Service located at www.thriftbooks.com; and that (iii) specifically, this user viewed

7   the book version of J.R.R. Tolkien's *The Hobbit*.

8

9

10

11



12

13

14

15

16

17

18     77.     Defendant also discloses to Facebook via the Pixel when a user adds an item to their

19   cart on the Thrift Books Website.  In the following network transmission, red squares highlight that

20   an individual user (i) added an item to their cart (shown by "ev=AddtoCart"); (ii) on ;

21   www.thriftbooks.com; and (iii) the product added to the cart was Madeleine L'Engle's *A Wrinkle*

22   *In Time*.

23

24

25

26

27

28

78.    Finally, the following screenshot shows Defendant transmitting to Facebook through the Pixel when a user checks out on the Website.  Specifically, the network transmission shows that a user checked out ("checkout" and "placeorder") on the Website (www.thriftbooks.com).  It is a reasonable assumption that if a user added an item to their cart and checked out, that user purchased the item(s) in their cart.

79.      Further, in each of the disclosed network transmissions depicted above, Defendant discloses precisely who the individual user that searched for items, viewed titles, and added an item to their car on the Website is.  Defendant does this by disclosing an individual user's "c_user cookie," a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID").  The cookie is a string of numbers that is unique to every Facebook account—distinguishing each FID from its peers.

80.      Any person, even those without in-depth technical expertise, can utilize the FID to identify owners of the FID via their Facebook profile.  Once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook FID to www.facebook.com (www.facebook.com/[FID]).  That step, readily available through any internet browser, will direct the browser to the individual FID's profile page, including all the information contained in or associated with the profile page, for the user associated with the particular FID.

81.      A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

82.      In each of the previous screenshotted network transmissions, red squares highlighted the "c_user" cookie and the individual FID associated with the account.  Notably, the FIDs were transmitted to Facebook in the same network transmission as each of events captured by the Pixel, meaning that Defendant simultaneously sends to Facebook a user's FID and the action tracked.  Once sent, it is not difficult to put together that the individual who owns the FID searched for, viewed, or purchased certain reading materials on the Website.

83.      Due to the integration of the Facebook Pixel on the Website, Facebook is able to intercept the information about the Website page the user viewed.  This information includes the specific audio visual and/or reading materials that the user searched for, all of which is included in the URL.  When Facebook intercepts this communication—made possible by Defendant's integration of the Facebook Pixel—Facebook effectively intercepts the exact reading material(s) that the individual is viewing or has obtained.

84.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

85.     One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[66]  Facebook, at a minimum, uses the fr cookie to identify users. [67]

86.     If a visitor has never created an account, an even smaller set of cookies are transmitted.

87.     At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [68]

88.     The c_user cookie expires after 90 days of inactivity on Facebook if the user checked the "keep me logged in" checkbox on the website.[69]

89.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[70]  If that happens, the time resets, and another 90 days begins to accrue.[71]

90.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[72]  If that happens, the time resets, and another 90 days begins to accrue.[73]

91.     The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[74]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*,

---

[66] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[67] *Cookies Policy*, Meta, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last accessed Feb. 4, 2025).

[68] *Id*.

[69] Seralthan, *Facebook Cookies Analysis*, Medium (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a (last accessed Feb. 4, 2025).

[70] *See id.*

[71] Confirmable through developer tools.

[72] *See Cookies Policy*, Meta, https://www.facebook.com/policy/cookies/ (last accessed Feb. 4, 2025).

[73] Also confirmable through developer tools.

[74] *First-Party Cookies*, PC MAG, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed Feb. 4, 2025).  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

1    Facebook.[75]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie

2    is sometimes sent as a third-party cookie, depending on whether the browser has recently logged

3    into Facebook.

4       92.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook

5    IDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event

6    data.

7    **B.    Defendant Discloses Users' Protected Reading And Personally
            Identifying Information to Pinterest**

8

9       93.    When a user searches for a book on the Website, Defendant discloses to Pinterest

10   through the Tag the contents of the user's search.  For example, the following screenshot of the

11   network traffic shows Defendant sending to Pinterest the following network transmission of a user

12   searching for "Tolkien."  In the Universal Resource Locator ("URL") of the request, red squares

13   highlight that the individual user: (i) viewed a page (denoted by the "ev=PageVisit"); (ii) that was

14   viewed on the Thrift Books Service located at www.thriftbooks.com; and (iii) specifically, this user

15   searched for "tolkien."

16   

25      94.    In the screenshots below, Defendant also discloses to Pinterest the user's Pinterest

26   user ID in the form of the _pinterest_sess cookie.  Although this field is hashed before it is sent to

27   ─────────────────────
     [75] *Third-Party Cookies*, PC MAG, https://www.pcmag.com/encyclopedia/term/third-party-cookie

28   (last accessed Feb. 4, 2025).  This is also confirmable by tracking network activity.

Pinterest, Pinterest has backend tools that allow it to decipher the information in the hashed field

and determine which individual user's Pinterest account conducted the tracked activity that

Defendant sent to Pinterest via the Tag.  Further, as depicted below, the Pinterest Tag also captures

and transmits to Pinterest the "ct_rt" cookie.  As mentioned above, this cookie contains the

Pinterest user's account ID in hashed form, which Pinterest is able to unhash through its own

backend tools and determine the individual Pinterest account holder.



95.    In addition, when a user views a specific title on the Website, Defendant also tracks

this as an event sends it to Pinterest via the Tag.  The following screenshots show a user viewing

J.R.R. Tolkien's *The Hobbit*.  This can be seen by the URL sent to Pinterest showing that the user

viewed J.R.R. Tolkien's *The Hobbit*, and that the event took place on the Website at

thriftbooks.com.  The screenshots below also show the same user's disclosed "_pinterest_sess" and

"ct_rt" cookies.  As mentioned earlier, while the cookies are first hashed before being sent to

Pinterest, Pinterest is able to unhash and verify the individual user using its own backend tools.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

▼ Request Headers

:authority:        ct.pinterest.com
:method:           GET
:path:             /v3/?
tid=2614239063593&pd=%7B%22np%22%3A%22gtm%22%2C%22pin_unauth%22%3A%22dWlkPU1qZzNORE16Wm1RdE5qTm1OUzAwTnpRNExSmxPV0l0WkdWbE16SmpZVGd6T0RVMQ%22%2C%22derived_epik%22%3A%22dj0yJnU9QTJCOXNkakFpZFWX0FNmmIzRGFYVEc4RWh4TFNqSHUmbj14cTlTdUsxUHVka28xX1dOUC04bDNRJm09MSZ0PUFBQUFBR2VpOVhJJnJtPTEmcnQ9QUFBQUFHZWk5WEkmc3A9Mg%22%7D&event=init&ad=%7B%22loc%22%3A%22https%3A%2F%2Fwww.thriftbooks.com%2Fw%2Fthe-hobbit_jrr-tolkien%2F245980%2F%3Fresultid%3D64e58487-f4be-4797-a37d-c47cb4e7b353%23edition%3D32363365%26idiq%3D799920%22%2C%22ref%22%3A%22https%3A%2F%2Fwww.thriftbooks.com%2Fbrowse%2F%3Fb.search%3Dthe%2520hobbit%22%2C%22if%22%3A3afalse%2C%22sh%22%3A%2F%2F152%2C%22sw%22%3A2753%2C%22mh%22%3A%228821a9da%22%2C%22is_eu%22%3Afalse%2C%22epikDataSource%22%3Anull%22C%22derivedEpikDataSource%22%3A%22fpc_ls%22%2C%22unauthIdDataSource%22%3A%22fpc_ls%22%2C%22architecture%22%3A32%2x86%22%2C%22bitness%22%3A%2264%22%2C%22brands%22%3A%5B%7B%22brand%22%3A%22Not%20A\Brand%22%2C%22version%22%3A%228%22%7D%2C%7B%22brand%22%3A%22Chromium%22%2C%22version%22%3A32%2132%22%7D%5D%2C%22mobile%22%3Afalse%2C%22model%22%3A%22%22%2C%22platform%22%3A%22Windows%22%2C%22platformVersion%22%3A%2219.0.0%22%2C%22uaFullVersion%22%3A%22132.0.6834.160%22%2C%22ecm_enabled%22%3Atrue%7D&cb=1738732926935&dbgppce=true

_pinterest_sess=TWc9PSZrSIZYZVIrLzUrcHIFMHZ4UVpsSFhmVDVaRIRrZnoxc0s0SjN6ZXlpbFVMUnRZeEhWTFVZeXUrL0FSbS9BQTNBNWw4LzJuc0czdGGY2TXhEUEjQzZ1NjNSd3JucGVLaTlzMzhYZVFEdEw2K3pmcTc1OGR5QThEKzAxRnZR0RU5Ha2h2emN2T0kwZmZFd003MWFCdk5ERko4VHpXNnJycGhCUlB1eG9NaHh6cGPFNUIxa0M1bWViN1N4R3RhN1BQcmZpMTNPM2Zpbjl1OUpEeGxtakRXai84bTlhUIk3cmxweEVaS1NWNDNqa05ycWowUZVhuVhdWR1R1huSFRQFRQYVNJeE5KcXFhZGhlMEzhSHZKdFdeFNjUnliMUwxbjNSdWNNYdGlXNkIvSDdaYW9R9RVjFkdjl1RU9XMUNBQUVhYk5CcXZyNnA0N05MRVMzdUdQc1NpWkWRWcFhxTmRhUU1aTzBIR3cyako1WEYyRmRYb09QcDICQ3hWSjZiU1dEStNQ2JxWjNxVEFHYUlwdCtTTnpYODZSVkJZIVip4eExnd0lBbnIYVkFYT1prbWpTUWJuZ05EN0lpdTBLdkExcFVONXBFL1NFQXlvd2hOaVJ5QU0wZJ5ZU0ZxJ0Zkl5ZEpOVlIMVEIKWIE4UzVKZEZMUDRyS1R0cnEvaHU2TkhGY3o0bkhaTXpNCNmJoNkhCeStYeldZdFhtT0lxLzlvZkJmeWVrMWVrVmrMGF2THBOaUJHY2Z2NR0lJYmQzU1F5bk9FfUljSHFVUnpEERIIramFVSlg4MFhWQXNsTEJNZW9KWkFeE11aG1wVU1r1RzUZMM4bDBVMEo2bXhqdG83G001ZRWNQaanlaL1ROMjZFQ2sxeGLGJ0aVpFZIQ5d2ZwbkxRb3U5VkVCb2hwWR1SeUIUeCtQd3BOK3VaJHBIQZR5Q01RJkF2MU1ZY0x5c3pKMFJXMkdkQ3ZLGWTdyQU5Fa0haYTJoVWITTkIVMjRhd1RsT3BQMmVYWU05Sk5LMzVjbzd4VEhvTTd0b0MTWsyddkrQTR2d3NncnBkZEVPZWhBRlp0bTc4Y4Y1V6MMidbWZ4YnB3OFlvcjA3Z\9DDhuVGxHMngva1lrdG10KzliR1hlbUhIe1r4U3ozuUHFSZHRSUGJvOCsxRXNqk3pLcHRBVIhscExeQexNHRm9PQWlOYlkxd28zUGRtdUzyzUx6dTFFqbkduNmsraVoyWUdUdUZ3FrMnZTRHrk1SmZJOHBUSFpaGtJOUw4L0dha3ZNa25wUFQ1UkRHY9uczJiRHo3cDfEJZVlUkVZdUwvMmsxMk5JRmZRSG9k7NbC9hc1dPK2wraVRjc2wvcy95aTQ3bS9SUU3dDRTgzUFVscDIYVVDcjNIR2RlVmcWl3byLfL2hpM3FUc2U1Qkld0t5SejZNpciQRnVzZlVqdk0rSIFUcm5rRGg2WENWQdTJ0eE51SG02Nw1Jb3Bx4aR2u2FU4TnE2cGFwWm44YXJORIJOQJR5M2NHMIluWG5QSjhFYU9LaJWY2RVdTltcEtKbGtNeUlvTDI0Mnp5eUQyUjhMFVZNaUYmVEdnZWpHenVJSUh1TUNgbTY2YWNNc2t1TTVdBPQ==; __Secure-

_pinterest_ct_rt=TWc9PSZ4c1NZWkFrRjYzY2tKUDFRSUJ2RENhd3Jqc0czdEIKZG9sMUJMZTdrbEEEwdHN2QUVXZndvTWhZQ2p3Z3VVadmtneEx0NExqM20zckFXK2KenpCQTdVNGIXOFNvWWV3M1TZINVJVVFhGM3dzbG9nc1YycjFoZZ1BMYkdWWkw1OTVtNU1vNUJjd27Qkt2eHFVV0l1eEy2Eb2pPSYVBhUE8yNE8wVTJFZzRPcDFUcC9hNDHyS0zD0eUUnRZaEl1SUl5RkRHOVBKT0hZT0QzeUU2SGFsY0NDQ0y9JeTg3aG5SBVFdIK2VrRXVyaFJmenl3OXNhbEY3czRiWWtqcE9OUlpjMIoyUTdKaUlvQUNJQU1hjT3Vhd3B2Z2Doo1UjBSOG0yazF3M1NLUGIrM3FEbV\J3WmI2ZFVYMmE0eVBFVzNWTjFwR0JLdFZaa3IxdXdUdXQa0UUvN3NKcIpHdVdjTk9ZGRjQ2I3UWpaK0lpc3hmmQ2xGamp1cUc1eHFZOVIQS1BUcEVYVjZwTGJpQTNQeC0ttV3InT0F0U05tYXl5dFl1ZJzGpDK2ZIWXNnSmIt
OFhjT1RWUXMZJdWU3dlozaHIvLy9yckRYeXNHUGlzcklhY1BsNXZxdjB0MktMZJMNGZGZQ0VpZ2iZYaVZadW9LeWNJOExZZTZXMFFnVlNCaHFELzQ9

---

1    96.    Further, when a user adds a title to their cart, Defendant also tracks this as an event

2 and sends it to Pinterest via the Tag.  The following screenshots show a user adding Madeleine

3 L'Engle's *A Wrinkle in Time* to their cart.  This can be seen by the URL sent to Pinterest, showing

4 the "event=addtocart;" that the item added to cart was titled "A Wrinkle in Time" written by the

5 author "Madeleine L'Engle;" and that the event took place on the Website at

6 www.thriftbooks.com.  The screenshots also show the user's disclosed "_pinterest_sess" and

7 "ct_rt" cookies.  In addition, as mentioned earlier, while the cookies are first hashed before being

8 sent to Pinterest, Pinterest is able to unhash and verify the individual user using its own backend

9 tools.

_pinterest_ct_rt=TWc9PSZhbTcyb1phQ2pZMWxuTTB2YmNCSWkxYkM2UkN2MkhiWlBHdC9FSCsvbkNOSm50eEtEU3VlOWVvTEpPeUN qa0Y4eGxFMHVxQjRRa1lNTU45elMrNjlEZU5ZODFaRi9ZL3pDWmRXejRMaGdDS2ZQSk50d3NFemUzSU1aVGp6QzVHcjg3dy9JMGQva mY0YnJxWVJCQ1VyZmdHK1dMdWpROGlzOU1vaHlWdkEzcW92K0tnbGxSdmdIMTAvVGxBSXlJazZWMHM0R0tkbmtZaGZiVG9HS001c WdURGE1UjlraFdGUUlQaVpBTXA1bzQ3VzBmUWJ3azAvaFlDTzlXa2VtZXK1LNIhsaFFPMzg1UVZPSnlQYzB5TTY0S1Y0aUM1Q3JVRlZQUHh ZREo1Z0kyeXZPdmNZemVNZnhNU1dnhXU1dMUXc4VTc2UjVkcUs0WUcwRlRpZ0dmRnB1Mkxxc3paa2p2tNkZnVWlxUlhULy9lbkNiNmIaMTR0R WdjMFhvMDBrck5zdVAzNzg1ZE5RV0V5eGpmend6SStsNkJ5RmNaekZqVzlYWWJQRkNGK0pJTlRqWHhLeEFkNEZPc2ZTZEk0d2t0dlhVT WJHbkF1WHlFQ0FaRGtlK1czeE1vMG43dDc01bWNycGMzTkNGdEtPbm40RnBEQ1VHdU5YOTNTQTNLUVhROXMvMSZKS2tSVVJ2NT ThmblRyQUFKa2RZQTlXUEFSL1E9
https://www.thriftbooks.com

97.     Finally, Defendant also discloses to Pinterest via the Tag when a user makes a purchase on the Website.  The following screenshots show Defendant disclosing to Pinterest the fact that a specific user checked out ("event=checkout", "checkout", and "placeorder") on the Website ("www.thriftbooks.com").  At the same time in the same transmission, Defendant also discloses the specific user's Pinterest account ID in the form of their " _pinterest_sess" and "ct_rt" cookies.  As mentioned earlier, while the cookies are first hashed before being sent to Pinterest, Pinterest is able to unhash and verify the individual user using its own backend tools.  While the disclosed checkout information does not contain the items purchased, it is reasonable to assume that if a user added an item to their cart and later checked out, they purchased the item(s) in their cart and not other items outside of their cart.

▸ Request Headers
:authority:        ct.pinterest.com
:method:           GET
:path:             /v3/?
event=checkout&ed=%7B%22np%22%3A%22gtm%22%2C%22value%22%3A7.27%2C%22currency%22
%3A%22USD%22%7D&tid=2614239063593&cb=1738789527888&dep=5%2CEVENT_TAGS_ABSENT&p
d=%7B%22np%22%3A%22gtm%22%2C%22pin_unauth%22%3A%22dWlkPU9EaGtaalZsWkRNdE1qYNZ
eTAwTURVMExUZ3lPRFV0VdRMU1tUXlNRZsTUdWbA%22%2C%22derived_epik%22%3A%22dj0yJnU9c
XILR19vckVoR1cyakIpV09vaUdhLXdvZWR1djd1TFUmbj1OY2FlUjVhMXBlaE9azmU3dzExWWpnJm09MSZ
0PUFBQUFBR2VaMHHBjJnJtPTEmcnQ9QUFBQUFHZWowcGMmc3A9Mg%22%7D&ad=%7B%22loc%22%3
A%22https%3A%2F%2fwww.thriftbooks.com%2fcheckout%2Forderfinal%2F%22%2C%22ref%22%3A%2
2https%3A%2F%2Fwww.thriftbooks.com%2Fcheckout%2placeorder%2F%22%2C%22if%22%3Afalse%2
C%22sh%22%3A1080%2C%22sw%22%3A1920%2C%22mh%22%3A%22882la9da%22%2C%22is_eu%22
%3Afalse%2C%22epikDataSource%22%3Anull%2C%22derivedEpikDataSource%22%3A%22fpc_ls%22%2
C%22unauthIdDataSource%22%3A%22fpc_ls%22%2C%22architecture%22%3A%22x86%22%2C%22bitne
ss%22%3A%2264%22%2C%22brands%22%3A%5B%7B%22brand%22%3A%22Google%20Chrome%22%
2C%22version%22%3A%22131%22%7D%2C%7B%22brand%22%3A%22Chromium%22%2C%22version
%22%3A%22131%22%7D%2C%7B%22brand%22%3A%22Not_A%3B0Brand%22%2C%22version%22%3A
%2224%22%7D%5D%2C%22mobile%22%3Afalse%2C%22model%22%3A%22%22%2C%22platform%22
%3A%22Windows%22%2C%22platformVersion%22%3A%22219.0.0%22%2C%22uaFullVersion%22%3A%2
2131.0.6778.266%22%2C%22ecm_enabled%22%3Atrue%7D

_pinterest_sess=TWc9PSYxT0kzUTU4UkNKdVNsa0I5anU4L0VHSURFbIZLYWgyVEJzNUdySE16d1pSckp5Z
W1yZ0IYV2JnUUUxNHRXM0YrVmM4cUx6ZmImQzU5bkdFeHZLU25vUndOQVIvTzJ6cFpCbDhISEo5Zzhza1
libHRIRWVuOGRoN1B3eXpJYTIrTUYwUWc2K3BKbTvvMER5b0w4eUIIOU1KYldvL215Wk9wMTBpd094ND
hJNE9JWDh6bIZpcWISYXI2R2sySW9SVUY5THFMNktqK0R2V21TRXF4REdDK1pRdnIRM21EVytYUFRJbmtn
R25zUIVoUkU5dmIQSUtadWdpUk16azBVS0dWa0tzdzg3M2hYZIgrM0h1RDNHb0UwNGp0dkpoRINSNzR
CMDQ4SIdkZ0dxNitUekF4NVpicUVGdUtqdDI4UIVLbWROMGc3a0VwV1JJNINDQzRUcnZUcCtzQ3FZYIF0e
m4xL1dHY0U2TWpocHFIDVEZhcmMyNIZGUkRXTDF5K0hWRjdhTkZLdWNHbjY1WFhML2YyZVdML29oSXZrWF
RqK2NwejZHSjVtSVJzb1FzbUU1WWVTK2I2SVBBdEpDdVJwQ1pTQ0YwZkZXTzhFd2d4MIV4a1NYR2hZbW
x1OW9Pams0QWVSZ0JKMVN2YTFpNzN4aTlGeUhtS24xSjE1UWszWHMwcUVWTINRWIgrdGJjTVFoTXg0a
zIFS2VPWXVJdDR3ajJjZko2N01zRkgzc3pzcDNDRTVndThWcHFUVDIROENtTXVhb2hrZ0Urd2RHc3k1WGVI
R1BXMUtGMm5tSXM2N3VaMHpWRjdhcU93b2RYU0IRaHpXMEsyUnFPSFN6L2ItSVdXMFd5bkI5ditENIBh
MnM2NTR0SG12TzduSDM0ZXBFSmhEeTgzbDZSdXd2UU44ODk2QTZKbkVLdno0YWFOS3dkbWExdVVCT
3Z1Vnpjekx/Ynh2L1RSQ1Q4L0UwN0hvVkc0d2pOdnpPYUs4SGQ0TDJPSHpSNVhQMjVoRXJYLzhGUWJzbn
BUTXdHRIk2cU9rZTBQUjFldGVIWWJLa1ZSbFQ4NTQzOXNPNDVBanIqUzITMWFOQ1h6TUY1LzRCVksyM3
pqc3FYVVIwUGm0xStjWXhUUW52Z2RGVEWWINIb1hsaWRiQW9Pa3BHQIg4SmdOeEcwOFpWazFjaVN5
MVJwWTBsWUVpMjQySGxaU1YvOEd4dVZCNXIPaFRQTVdyWWxacXdkbGdZcG9XMGh4K0dncldwNWQv
bEFjMVNHK3Y4VVZLK3prWmZHa2JJZVU9RbTVsYUpCQ2VSdEprSUx4MmdRbEZvU09ueGIZdXREVmVQUF
pOOXQ4cnIHMGg0SzN2Q1RBRndLczNtb0FweDdkbFVnNFZqeWIYaFpKMzIzU1h4NU1vSnvGdGNjK3o2bX
pUU3VvT2FFOTRGaWF3Y3ByUHFYa2ZTOEtzNERuV1AwU2FqVnV6SGZNNnnuudWpZWFMyUXNxR1JPb1R
GWGNOUIFrSjAyRDF6bUtkOEt5WnVLUTZWc3ZGbGIqU0RUTDJ4VEtEdIVId1R3U3I1MUl4cVRsS21mRmRU
V3FjaStveUMzczF5cU4wSXM3REtLRjYxMkNETStmS29UMEQ4Qk4wL0RjbzRrWWFKMEdJUDlhUEItYW4zdk
hsZ3Z6VWVSS01QVi82VHVDNIMraIJmZzE2OWFib2JuZUNqMmVFMkhIWDZLdmNqQ0Ftb1BUVENvZE9P
WDJnanc4SINVN2dsaWkwRndEU1VQVVdjS3EwbkJpdmVtYndldTN3bXlVRXImL0pcEIrMmRNeXdvSmJQ
WktubjJmbjV3OCs0PQ==; _Secure-

_pinterest_ct_rt=TWc9PSZkZIFpZnNBallMamt1eG16OHNFbC9iRUV2SzFFWmxDVzZobzk3TU9vMi9EbVVG
MVNRMHNBdXN3ZGJyRWhhemlwb2aamNLWUF2c0h5U3BTSUFUZVQ5QXYwS3JJb1N6ckhnamJJNVEVTe
k50TnZWbUhYT1ZuMnFhVHUxqWUNrUIItTazMrYVZld2x6N2mRjTGNibTg4eit2aDYwYkUwUWk5dCt5dVpid0h
iT3dZamh1Zm,JreWtvQW1pOFZ0TEhTWWVsbjdcz3VDV3B5K0pNQjRrR2N0aktRd3pKWkd0Tlh5WmNZU
Dk0ekt2K29hK1FXVWtTZnZoRC9tY2dkbGNGN0toMUw1Tjg1Y1pDbDd3Q3M4Nm03Q2ISV0JBUVgxUFh4
dC9HS255VXFIYndieGdJRek1ajcrRIAxWCtWQ2JRS1hremEwYTJBVE1pdmYzVnNWV1FnM0xoRXB4dXhBXBVTzh
vZDFES5mJ5Ym5Lay8zd1RwcUNYOWk3bTBIQ20wYmRTMGI4VzZhSENHNQIIIDeWIQNU55Y3grQ0dLUFdMZF
ZIWitqekRpMzIndFV2VW1kcjdppMTdLdTZVc1NmajYySFoyQWdkVGVmL29JVUpBa1dVQmFpPWFBINVRjcXV
xT1VLekw0UE5UTVBBQTd4ZXU2L3NPajhDK0JIdTJMSm1ZbmhHdzIjVERwdkZjOCZNZWx2QIhUbk5JdIArVk
9Ed0VBSnh6dWVlb009

98.    Thus, Defendant discloses to Pinterest via the Tag the exact reading materials that users search for, view, and purchase on the Website, as well as which individual users did so.

## IV.   DEFENDANT DISCLOSES USERS' PII AND READING HISTORY FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

99.    **_Facebook._** Defendant transmits the foregoing personally identifiable information and record of materials viewed and obtained of users on the Website to Facebook so that Facebook

can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

100.    According to Facebook, the Pixel "works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[76]   The Pixel "relies on Facebook cookies, which enable [Facebook] to match [] website visitors to their respective Facebook User accounts."[77]   Facebook offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[78]   Advertisers can also create their own tracking parameters by building a "custom event."[79]

101.    This gathered information is used for marketing and advertising.  Specifically, the Pixel's library of functions can be used to "[t]rack conversions [] in the Ads Manager[,] … to define custom audiences for ad targeting, [and] for Advantage+ catalog ads campaigns[.]"[80]

102.    Taking these one by one, "track[ing ] website visitors' actions[,] also known as conversion tracking[,] … can be used to analyze the effectiveness of [a] conversion funnel and to calculate [] return[s] on ad investment[s]."[81]   Once a client is "tracking conversions, [Facebook] recommend[s] that [the client] use them to … optimize [] ads for website conversions."[82]

---

[76] *Meta Pixel*, Meta, https://developers.facebook.com/docs/meta-pixel (last accessed Feb. 4, 2025).

[77] *Meta Pixel: Get Started*, Meta, https://developers.facebook.com/docs/meta-pixel/get-started (last accessed Feb. 4, 2025).

[78] *Specifications For Meta Pixel Standard Events*, Meta, https://www.facebook.com/business/help/402791146561655 (last accessed Feb. 4, 2025).  *See also Meta Pixel: Standard Events*, Meta, https://developers.facebook.com/docs/meta-pixel/reference (last accessed Feb. 4, 2025).

[79] *About Standard And Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025); *see also Marketing API: App Events API*, Meta, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

[80] *Meta Pixel*, Meta, https://developers.facebook.com/docs/meta-pixel (last accessed Feb. 4, 2025).

[81] *Meta Pixel: Conversion Tracking*, Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last accessed Feb. 4, 2025).

[82] *Id.*

---

103.    A "custom audience is an ad targeting option"[83] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[84]  Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Facebook's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[85]  Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[86]

104.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed.  This allows [Facebook clients like Defendant] to create thousands of ads without having to configure each of them individually."[87]  Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[88]

105.    In short, Facebook states[89] that the Pixel can be used to:

- Make sure your ads are shown to the right people.  Find new customers, or people who have visited a specific page or taken a desired action on your website.

---

[83] *About Custom Audiences*, Meta, https://www.facebook.com/business/help/744354708981227 (last accessed Feb. 4, 2025).

[84] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[85] *Id.*

[86] *Id.*

[87] *Meta Pixel for Advantage+ Catalog Ads*, Meta, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads (last accessed Feb. 4, 2025).

[88] *Id.*

[89] *About Meta Pixel*, Meta, https://www.facebook.com/business/help/742478679120153 (last accessed Feb. 4, 2025).

- Drive more sales.  Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- Measure the results of your ads.  Better understand the impact of your ads by measuring what happens when people see them.

106.    Gathered information is also used for analytics.  Namely, the Pixel helps "understand[] the actions people take on [a] website."[90]  "Examples of actions include adding an item to their shopping cart or making a purchase.  The Pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Facebook] Events Manager.  From there, [a client will] be able to see the actions that [its] customers take."[91]  This allows Facebook clients to "segment [their] website visitors into groups based on the actions they have taken on [their] website."[92]  Additionally, with the Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[93]

107.    Defendant uses the Pixel for such marketing, advertising, and analytics purposes.  Defendant obtains revenue from the book and audiobook purchases of users on the Thrift Books Service.  Defendant knows that its ability to generate revenue depends in large part on the quality of its catalog content.  Therefore, Defendant employs the Pixel to spy on users and intercept the communications of users viewing and obtaining reading material.  Defendant then gathers that information and catalogs it, creating an individualized profile of each user.

108.    Defendant analyzes large masses of this user profile information to locate trends and adjust its digital content accordingly, as well as to serve "interest based ads" to users.

---

[90] *Id.*

[91] *Id.*

[92] *Custom Audiences*, Meta, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences (last accessed Feb. 4, 2025).

[93] *About Standard And Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025).

109.    **Pinterest.**  In addition, Defendant transmits the foregoing personally identifiable information and record of materials viewed and obtained of users on the Website to Pinterest so that Pinterest can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

110.    Pinterest begins by tracking so-called "conversions" through the Tag integrated onto a developer's website.[94]  These are "action[s] on [Defendant's] website, such as signing up for a newsletter or buying a product."[95]  There are nine different conversions that the Tag tracks, including a customized action that Defendant can set:

- Pagevisit: Views of primary pages, such as product pages and article pages
- Viewcategory: Views of category pages
- Search: Searches on your website
- Addtocart: Items being added to shopping carts
- Checkout: Completed transactions
- Watchvideo: Video views
- Signup: Sign-ups for your products or services
- Lead: Interest in your products or services
- Custom: Special event unique to your site

111.    Because these different conversions are transmitted to Pinterest along with cookies that identify an individual's Pinterest account ID, Pinterest is then able to organize the data into an individualized profile for every Pinterest account.  The more data Pinterest accrues and adds to its user portfolios, the more valuable the Pinterest Tag is to developers like Defendant who rely on Pinterest to assist in marketing, analyzing, and advertising their users' data and boost sales of their products.

112.    The above conversions are not the only event tracking functions that Pinterest offers developers like Defendant to maximize its advertising, marketing, and analytics.  Pinterest also

---

[94] *Track Conversions With The Pinterest Tag*, Pinterest, https://help.pinterest.com/en/business/article/track-conversions-with-pinterest-tag (last accessed Feb. 4, 2025).

[95] *Id.*

includes a function that allows developers to target audience members with certain notices and thereby "reach a specific group of people by combining information about [Defendant's] customers with information about how people use Pinterest."[96]  Pinterest allows Defendant to create a "target audience based on one or more specific event[s]" that the Pinterest Tag tracked.[97]  For example, Defendant may want to "retarget visitors who added a specific type of product to their cart but did not check out," or "retarget visitors who … landed on specific" pages, like Defendant's "checkout" page.[98]  In other words, based on Pinterest's accrued user behavior data and user profiles, Defendant can set up advertising campaigns to target certain groups of people.  Thus, Pinterest's accrued user data allows Defendant to enhance its marketing and advertising to Website users, and provides analytics support to further boost Defendant's data analytics processes.

## CLASS ACTION ALLEGATIONS

113.    **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as all persons in the state of California who, during the class period, had their personally identifiable information or protected reading information disclosed to Facebook, Pinterest, or other third party entities, as a result of using the Website (the "Class").

114.    Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

115.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

116.    Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this

---

[96] *Set Up Audience Targeting*, Pinterest, https://help.pinterest.com/en/business/article/audience-targeting (last accessed Feb. 4, 2025).

[97] *Id.*

[98] *Id.*

action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

117.    **Numerosity/Ascertainability.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Facebook and Pinterest.

118.    **Typicality.**  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used the Website and, as a result of Defendant's unlawful conduct, had their personally identifiable information and private reading information intercepted by Facebook and Pinterest without their express written authorization or knowledge.  Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

119.    **Adequacy.**  Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of data privacy litigation specifically.  Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

120.    **Common Questions of Law and Fact Predominate/Well Defined Community of Interest.**  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include:

(a)    Whether Defendant intentionally tapped the lines of internet communication between account holders and the Thrift Books Service;

(b)    Whether the Website's webpages (including thriftbooks.com) contain code that permits third parties, such as Facebook and Pinterest, to intercept users' personally identifiable information, protected reading information, and related communications;

(c)     Whether Facebook is a third-party eavesdropper;

(d)     Whether Pinterest is a third-party eavesdropper;

(e)     Whether Defendant knowingly transmitted users' personally identifiable information and library use records to the Third Parties;

(f)     Whether Plaintiffs' and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(g)     Whether Defendant's conduct, which allowed the Third Parties—unauthorized persons—to view Plaintiffs' and Class Members' personally identifiable information and their search and purchase records of their reading materials, resulted in a breach of confidentiality;

(h)     Whether Defendant violated Plaintiffs' and Class Members' privacy rights by using third-party technology, such as the Facebook Pixel and the Pinterest Tag, to allow third parties to intercept users' online communications along with information that uniquely identified the individuals;

(i)     Whether Plaintiffs and Class Members are entitled to damages under CIPA or any other relevant statute; and

(j)     Whether Defendant's actions violate Plaintiffs' and Members of the Class's privacy rights as provided by the California Constitution.

121.    **Superiority.**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631
### (On Behalf Of The Class)

122.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set

forth herein and bring this count individually and on behalf of the members of the Class.

123.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications."  Cal. Penal Code § 630.

124.    A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

Cal. Penal Code § 631(a).

125.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph.  *Id.*

126.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

127.    At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiffs' and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiffs and Class Members.

128.    Defendant, when aiding and assisting the wiretapping by the Third Parties, intended to help Facebook and Pinterest learn some meaning of the content in the URLs and the content the user viewed or requested.

129.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and the Pinterest Tag both fall under the broad catch-all category of "any other manner":

a.    The computer codes and programs that Facebook used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

b.    The computer codes and programs that Pinterest used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

c.    Plaintiffs' and Class Members' browsers;

d.    Plaintiffs' and Class Members' computing and mobile devices;

e.    Facebook's web and ad servers;

f.    Pinterest's web and ad servers;

g.    The web and ad-servers from which Facebook tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

h.    The web and ad-servers from which Pinterest tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

i.    The computer codes and programs used by Facebook to effectuate its tracking and interception of the Plaintiffs' and Class Members' communications while they were using a browser to visit Defendant's Website;

j.    The computer codes and programs used by Pinterest to effectuate its tracking and interception of the Plaintiffs' and Class Members' communications while they were using a browser to visit Defendant's Website; and

k.    The plan Facebook carried out to effectuate its tracking and interception of the Plaintiffs' and Class Members' communications while they were using a web browser to visit Defendant's website.

l.    The plan Pinterest carried out to effectuate its tracking and interception of the Plaintiffs' and Class Members' communications while they were using a web browser to visit Defendant's website.

130.    The reading records that Defendant permitted Facebook to intercept via the Website's integration of the Facebook Pixel, including users' history of purchased and viewed book and audiobook materials, constitutes protected information.

131.    The reading records that Defendant permitted Pinterest to intercept via the Website's integration of the Pinterest Tag, including users' history of purchased and viewed book and audiobook materials, constitutes protected information.

132.    As demonstrated above, Defendant violated the CIPA by aiding and permitting third parties to receive its users' online communications through the Website without their consent.

133.    As a result of the above violations, Defendant is liable to Plaintiffs and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

134.    Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

<u>**COUNT II**</u>
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf Of The Class)**

135.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

136.    Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

137.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

138.    Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

139.    Pinterest's business tools, including but not limited to the Pinterest Tag and the Pinterest Conversions API are also "electronic amplifying or recording device[s]."

140.    Cal. Gov't Code § 7927.105 states that a "patron use record[]" includes both:

(1) Any written or electronic record that is used to identify a library patron and is provided by the patron to become eligible to borrow or use books and other materials. This includes, but is not limited to, a patron's name, address, telephone number, or email address.

And

(2) Any written record or electronic transaction that identifies a patron's borrowing information or use of library information resources. This includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries.

141.    Cal. Civ. Code § 1798.90 states that "personal information" means:

(A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.

(B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

(C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

142.    Accordingly, any information that "is used to identify a library patron," "identifies, relates to, describes, or is associated with a particular user" of a book service, "identifies a patron's borrowing information or use of library information resources," constitutes a "unique identifier [that] … is used to identify, relate to, describe, or be associated with a particular user or book," or "relates to, or is capable of being associated with a particular user's access to or use of a book service or a book" qualifies as protected information under California law.  Plaintiffs and Class Members accordingly had a privacy right to keep their search and purchase records of reading materials made on the Thrift Books Service confidential.

143.    Specifically, the following pieces of information provided by Plaintiffs and Class Members to the Website constitute private, protected information: users' FIDs (and through them, their publicly available Facebook accounts), users' Pinterest account IDs in the form of their

"_pinterest_sess" and "ct_rt" cookies, users' specific book title search requests on the Thrift Books Service, and users' purchased materials on the Thrift Books Service.

144.    At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other.  In addition, at all relevant times, Pinterest intentionally used its business tools to eavesdrop on and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other.

145.    When communicating with Defendant and using the Thrift Books Service, Plaintiffs and Class Members had an objectively reasonable expectation of privacy, based on Cal. Gov't Code § 7927.105 and Cal. Civ. Code § 1798.90.  Thus, Plaintiffs and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and therefore did not expect that other, third-party entities like Facebook and Pinterest, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

146.    Plaintiffs and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiffs or Class Members consented to Facebook and Pinterest's intentional use of electronic amplifying or recording devices to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

147.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT III
### Invasion Of Privacy Under California's Constitution
### (On Behalf Of The Class)

148.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

149.    Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information;

and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

150.    At all relevant times, by using the Facebook Pixel to record and communicate users' FIDs alongside their protected reading activity, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.  In addition, at all relevant times, by using the Pinterest Tag to record and communicate users' Pinterest accounts alongside their protected reading activity, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

151.    Plaintiffs and Class Members had a reasonable expectation that their communications, identity, and reading information would remain confidential and that Defendant would not install wiretaps such as the Pixel and the Tag on the Website.

152.    Plaintiffs and Class Members did not authorize Defendant to record and transmit Plaintiffs' and Class Members' protected reading history alongside their personally identifiable information to third parties such as Facebook and Pinterest.

153.    This invasion of privacy is serious in nature, scope, and impact because it relates to users' protected communications requesting or obtaining reading materials.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

154.    Accordingly, Plaintiffs and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    For a determination that this action is a proper class action;

b.    For an order certifying the Class, naming Plaintiffs Shamsi and Johnston as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

c.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

d.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

e.    For an award of compensatory damages, including statutory damages where available, to Plaintiffs and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiffs and Class Members their reasonable attorneys' fees and expenses and costs of suit; and

k.    For an order granting Plaintiffs and Class Members such further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: February 10, 2025

**BURSOR & FISHER, P.A**.

By: ___ /s/ *Philip L. Fraietta* ___

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiffs and the Putative Class*